SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

William K. WARREN, Jr. and Warren Fund, Defendants.

Civ. A. No. 73–980.

United States District Court, W. D. Pennsylvania.

Aug. 29, 1977.

Robert M. Laprade and Barbara Brandon, Securities and Exchange Commission, Washington, D. C., for plaintiff.

Frank L. Seamans and Wm. Alvah Stewart, III, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for defendants.

## OPINION

SNYDER, District Judge.

This matter came on for hearing on Defendants' Motion to Dissolve, Suspend or Modify Permanent Injunction under Rules 60(b)(5) and (6) of the Federal Rules of Civil Procedure [1] seeking relief from prospective application of the Injunction previously is-

sued out of this Court. The Motion will be granted.

On November 5, 1973, the Plaintiff filed a Complaint essentially alleging that on or about October 1, 1968 and January 20, 1969, William K. Warren, Jr. caused a company which he controlled to borrow $1,00,000 from a bank; that security for the two loans were through margin securities; and even though William K. Warren, Jr. executed Federal Reserve Form U–1 (Statement of Purpose of a Stock-Secured Extension of Credit by a Bank) stating that the loan proceeds were to be used for "corporate purposes", he transferred them to the Warren Fund which, in turn, at his direction, used the proceeds to purchase margin securities in excess of amounts allowable under Federal securities laws pertaining to margin restrictions. Warren's conduct was alleged to be aiding and abetting violations of Section 7(d) of the Exchange Act and Regulation U promulgated thereunder by the Federal Reserve Board.

On November 15, 1973, Warren and the Warren Fund filed Consents to the Final Judgment of Permanent Injunction which, with the exception of jurisdictional questions, constituted neither an admission nor denial of the allegations of the Complaint. The Consents specifically provided that they were not to ". . . constitute any evidence nor any admission . . . with respect to any such issue or of any wrongdoing or liability for any purpose." This Court, without a hearing, entered its Final Judgment of Permanent Injunction on November 15, 1973, based upon the Defendants' Consents which had been presented to it.

On January 27, 1977, Defendants filed their Motion to Dissolve, Suspend or Modify Permanent Injunction. Thereafter, the Securities and Exchange Commission filed a

---

1. F.R.Civ.P. 60(b)(5) and (6) provide:

"(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence of Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: * * *

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment."

Motion to Dismiss the Motion to Dissolve, etc., a Motion to Strike and Require Defendants to Specify Facts, and an Amended Motion to Strike. These were denied on May 16, 1977, and a hearing on the Motion presently before the Court was set for May 23, 1977.

In essence, the Defendants contend that the continued existence of prospective application of the Permanent Injunction constitutes an extreme hardship and an unreasonable burden, and is a grievous and serious impediment to Warren's lawful activities. They further contend that the continued application of the Injunction serves no useful or meaningful public purpose, especially when measured or weighed against the inequities resulting from its continuation. Extensive testimony was taken at the hearing and the matter was thoroughly briefed by the parties.

## I. THE APPLICABLE LAW.

The Securities and Exchange Commission has urged upon us certain factors or standards from various appellate decisions, such as *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932); *Securities and Exchange Commission v. Advance Growth Capital Corporation*, 539 F.2d 649 (7th Cir. 1976); *Securities and Exchange Commission v. Jan-Dal Oil & Gas, Inc.*, 433 F.2d 304 (10th Cir. 1970); and *Humble Oil & Refining Co. v. American Oil Company*, 405 F.2d 803 (8th Cir.), *cert. den.* 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969). An examination of these cases, however, does not bear out the automatic application of these standards.

In *United States v. Swift & Co., supra*, after years of litigation, the Court refused to modify a decree which enjoined five leading meat packers without a "clear showing of grievous wrong evoked by new and unforeseen conditions" (Id. 286 U.S. at p. 119, 52 S.Ct. at p. 464). But the Supreme Court itself has taken a very strong stand in limiting the application of *Swift* in *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, at 248, 88 S.Ct. 1496, at 1499, 20 L.Ed.2d 562 (1968), when it said:

"*Swift* teaches that a decree may be changed upon an appropriate showing, and it holds that it may *not* be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly and restrictive practices) have not been fully achieved."

*Securities and Exchange Commission v. Advance Growth Capital Corporation, supra*, firmly supports the proposition that the plaintiff failed to make an appropriate showing of a grievous wrong or extraordinary circumstances such as would permit the court to find that the prospective application of that final decree was no longer applicable. In that case, there was a suggestion of the possible danger of recurrent violations. It is reasonable then to infer that the Seventh Circuit's holding may well have been otherwise if the parties had demonstrated an elimination of the original danger.

In *Securities and Exchange Commission v. Jan-Dal Oil & Gas, Inc., supra*, the Tenth Circuit was limited to a consideration of the underlying danger which a final decree was designed to foreclose and which was still in existence, and whether the moving party was exposed to severe and extreme hardship when it showed only compliance with a decree in effect some eight months and a contention that the injunction might cause a problem with a registration statement and a proposed sale of oil and gas interests.

And in *Humble Oil & Refining Company v. American Oil Company, supra*, the Eighth Circuit, purportedly following *United States v. Swift & Co.*, stated (405 F.2d at 813):

"To repeat: caution, substantial change, unforeseenness, oppressive hardship, and a clear showing are the requirements."

The Court there recognized " 'significant changes in condition not foreseeable at the time the injunction was granted,' thus emphasizing change and unforeseeability." *Id.*, quoting *Bowdil Co. v. Central Mine Equip. Co.*, 216 F.2d 156, 160 (8th Cir. 1954), *cert. den.* 348 U.S. 936, 75 S.Ct. 356, 99

L.Ed. 734; and *Hygrade Food Products Corp. v. United States*, 160 F.2d 816, 819 (8th Cir. 1947). An examination of the *Bowdil* and *Hygrade* cases, however, support the proposition that usually the courts are involved in situations where rights have not accrued upon facts which are stable, permanent, and impervious to change, but with those involving supervision of changing conduct or condition. Particularly appropriate is Judge Friendly's comment in *King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 418 F.2d 31 at p. 35 (2nd Cir. 1969), where he says:

> "While changes in fact or in law afford the clearest bases for altering an injunction, the power of equity has repeatedly been recognized as extending also to cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes."

Thus, we believe that there is a judicial discretion under Rule 60(b) which cannot be rigidly confined, but which, of course, must be exercised within certain limits. No one, therefore, would argue that final orders, including permanent injunctions, are to be overturned capriciously. But the court's discretion can be exercised with inherent equitable power to weigh the severity of the alleged danger which the injunction was designed to eliminate against the continuing necessity for the injunction and the hardship brought by its prospective application.

Under Rule 60(b), we must thus determine "whether it is equitable that the judgment should have prospective application" or "whether there is any other reason justifying relief from the operation of the judgment." We will then look at the danger which the injunction was intended to correct and the foreseeability of the claimed oppression and hardship brought by the injunction.

The Securities and Exchange Commission has urged upon us a much more rigid approach than that set forth above. In substance, they argue that after the initial investigation in this case, the Defendants, fearing criminal prosecution, went to the Justice Department with a proposal which in essence included the Consents to the Final Judgment, and which disposed of the entire matter. Therefore, having disposed of the matter through a Final Permanent Injunction, the Defendants should not be heard to raise any contention that either violations are no longer probable, or that the drastic results were not foreseeable. It is their position that once a permanent injunction has been entered, the investing public "has the protection of the law in that we as a small agency do not have the manpower or funds to set out to police every person who has been the subject of an investigative action, or a Commission action. Therefore, once a person is under injunction, and it is a permanent injunction, then if that person does violate the injunction there is a contempt proceeding. Therefore, the public is protected, helped by the fact that there is a permanent injunction." For this reason, they argue that the Court can and should dissolve an SEC injunction only upon a clear showing of substantial change in circumstances and substantial, unforeseen and oppressive hardship.

We feel, however, that we must look at the equities of the present situation and examine the testimony in that light.

## II. FINDINGS OF FACT.

### A. THE BACKGROUND.

In the summer and early fall of 1973, the Department of Justice conducted an investigation of possible violations of Regulation U promulgated under Section 7(d) of the Exchange Act and Title 18 United States Code, Section 1001, relating to forms filed thereunder with Mellon Bank and signed by William K. Warren, Jr. In February of 1973, a presentation was made to the Justice Department by the lawfirm of Hagan & Harrison of Washington, D. C., which was composed of a summary of background facts from sixteen exhibits and a discussion of the law and relevant equitable considerations.

We are principally concerned here with Warren American Oil Company (WAOC) of which William K. Warren, Jr. has been President since 1956. At the times here pertinent, WAOC was the owner of gasoline plants and oil and gas producing properties. Among its primary operating activities were the drilling of exploratory gas and oil wells, as well as the acquisition of oil and gas properties.

WAOC stock ownership was as follows:

| | |
|---|---|
| Mrs. William K. Warren, Sr. | 47.68% |
| St. Francis Hospital of Tulsa, Oklahoma (donated by Mrs. Warren, Sr. in 1972) | 8.72% |
| The Warren Foundation | 25.30% |
| The six Warren children, equally | 18.30% |

During the summer of 1968, Warren, Jr. and Warren, Sr. discussed raising additional money to diversify the son's company, WAOC. The son preferred to raise the money by selling some securities. However, his father felt the securities were too valuable and a loan would be better. While Warren, Sr. was in Pittsburgh, Pennsylvania to attend a Gulf Oil Corporation Board of Directors Meeting, he decided to call Mr. Gilpatrick, a Vice-President of Mellon Bank in Pittsburgh with whom he had several previous business dealings, to arrange for a loan of up to $3,200,000.[2] He said his son would contact the bank regarding the actual takedown of the loan proceeds.

In September of 1968, Warren, Jr. arranged to draw $500,000 of the loan proceeds, and in January 1969 he drew another $500,000. Because these loans were secured by Warren, Jr. with marketable securities (Gulf stock), on each occasion Mellon Bank sent him a Form Reg. U–1 with the other loan documents. The form stated that the loan was to be used for "corporate purposes". (The exact use of the loan proceeds

had not been determined by Warren, Jr. and his father. One possible use was the purchase of a pipe bending company in Texas, but that deal fell through and Warren, Sr. therefore had the loan reduced to $2,000,000.) When Warren, Jr. got the documents pertaining to the first takedown, he called his father to suggest again that the money be raised by selling securities. But the father, not knowing that a U–1 Form was among the documents sent to Warren, Jr., told his son to fill out all the loan documents and send them to the bank. Warren, Jr. did so and signed the U–1 Form. He did the same on the second takedown. (A copy of the U–1 Form is attached as Appendix A). The loan proceeds were ultimately channeled through a hedge fund and used to purchase marketable securities. Both loans were repaid within six months. It was not until the Government began investigating the matter in 1973 that Warren, Sr. first learned of the U–1 Forms.

The Securities Exchange Commission and the Justice Department investigations of the matter were initiated by information about the transactions received from a former employee, Mr. Dogherty, who was relieved of his employment by Warren, Jr. Warren, Jr. first learned of the Commission's investigation early in 1972, but it was not until July of 1973 that he had any personal communications with representatives of the Commission or the Justice Department. He was represented by Attorney William Pitman at a meeting in Tulsa in July of 1973, and that August he retained Attorney Arthur Mathews as his counsel. Mr. Mathews made Warren, Jr. aware of the potential criminal penalties that could evolve from the Justice Depart-

---

**2.** Mellon Bank had, prior to 1968, made many loans to the Warren Family and their interests. In 1962, Warren, Sr. had organized The Warren Petroleum Company which was merged into the Gulf Oil Corporation in 1956. Warren, Sr. was also past Chairman of the Board of Transwestern Pipeline Company, which is a natural gas pipeline transporter for gas picked up in Texas, New Mexico and Oklahoma, and transported to the borders of California. For many years, Warren, Sr. was a Director of Gulf Oil

Corporation and is now a Director Emeritus since 1972. Warren, Sr. and his wife founded The Warren Foundation in 1945 which was responsible for the construction of the St. Francis Hospital in Tulsa, Oklahoma, costing in excess of $11,000,000. There is also a medical research facility at the Hospital known as The William K. Warren Medical Research Center and a cancer center known as The Natalie Warren Bryant Medical Center.

ment investigation if an indictment were returned and he were convicted. He was also made aware of the possibility of civil litigation and was under the impression that such a trial would be held in Tulsa, Oklahoma, with attendant publicity in the area in which he resided and was employed.

His counsel raised the possibility of a consent decree, which idea Warren, Jr. rejected at first in light of the fact there had been no report from the Justice Department on their investigation, but he then accepted the idea. He said he did so because of pressing personal divorce matters and to eliminate publicity which he felt might affect a reconciliation in his marriage. He was especially fearful of publicity because one of his wife's attorney's law partners was a publisher of his local morning newspaper. In addition, his mother had had a heart attack and he was concerned about her health and the possibility of his indictment and resulting publicity. He was also concerned about the reputation of the Warren Petroleum Corporation and the William K. Warren Foundation. He understood from Mr. Mathews that any injunction would involve disclosure on any stock or bond issues by companies on whose Boards he was a member, and that the injunction could probably be lifted in four to five years by making application to the courts, so long as he complied with its terms.

Subsequent to the entry of the Consent Decree, it was determined that an addition should be made to the St. Francis Hospital facilities which would require in excess of $8,000,000 of public bonds, and financial advisors indicated that the Securities and Exchange Commission should either remove the permanent injunction or give some relief so that Warren, Jr. or the Foundation would not have to put on the Perspectus the fact that a permanent injunction was outstanding against them. At that time, Warren, Jr. was the Chairman of the Board of the Foundation and the Foundation was guaranteeing the bond issue. The bonds were issued January 1, 1976, as Warren, Jr. had resigned his position as Chairman of the Board in July of 1975. This was

brought about by Warren, Sr. because of his concern that the revelations of the injunction on the Perspectus would have a definite depressive effect, in the sense that anyone examining the Perspectus on the bonds would pass them over when they saw that an injunction had been entered.

In addition to Warren, Jr.'s involvement with WAOC and the Warren Foundation, he was at that time on the Board of Directors of the Williams Companies, a New York stock exchange company. He resigned in May of 1973 because of the investigation then being conducted. He was also on the Board of the First National Bank and Trust Company of Tulsa and resigned from the Trust Committee in March of 1974 because the Committee was continually dealing with stocks and bonds of the trusts administered by the bank. He did not resign from the Board, although he attempted to do so in May of 1974, and again in 1975. He was asked to fill out disclosure forms for the Amended 10K Report that the bank had to file with the Securities and Exchange Commission. He was also a Director of the Sooner Federal Savings and Loan Association in Tulsa, which was the largest Savings and Loan in Oklahoma. At that time, the Chairman of the Board wanted to take the company public in view of similar actions being taken by Savings and Loans in San Francisco. Warren, Jr. therefore resigned that Directorship in August of 1974. He was a Member of the Board of Directors of St. Francis Hospital and wanted to resign at the time he was asked to resign from the William K. Warren Foundation of which he was Chairman, and in June of 1975, he did not stand for re-election to the Foundation's Board.

For the two years prior to the entry of the injunction, Warren, Jr. did very little and refused to become involved with a computer company in the oil and gas field. A strong investment possibility in a company in Tulsa was brought to him but he felt he could not make the investment without becoming a Member of the Board which he considered impossible in light of the injunction. He also had prospects of starting a

corporation called SIRN (which are the initials of himself and his children). Again, the effect of the disclosure of the injunction caused him to hesitate.

Prior to the entry of the Consent Decree, Warren, Jr. had been informed by his attorney that such a decree possibly would have to be disclosed by any corporations of which he was a Director that wanted to issue new stock or bonds. Further, although he had originally thought the Decree would be limited to ten years, prior to his signing, Warren, Jr. knew the injunction would be permanent. It is also true that Warren, Jr. worked out an acceptable location for the entry of the Consent (Pittsburgh) as opposed to Tulsa, his place of residence.

It is also true that at the time Warren, Jr. took out the loan with Mellon Bank, he advised Mellon that the monies were going to develop properties belonging to WAOC. Between the time of the initial contact with Mellon Bank and the actual taking out of the loan, Warren, Jr. had created a hedge fund, but there was no indication to Mellon Bank that the money received from it was to be used for other than various improvements to property. (Tr. 183–185)

### B. THE EFFECT.

Clearly, an injunction of the type entered here has some disabling effect, for its disclosure acts as a screen or flag, and more than likely the particular investment opportunity would no longer be considered by investment houses. At the least, it would call for much more detailed investigation than going through the normal procedures. In fact, one witness characterized the effect as the same as taking the Fifth Amendment. "They (the investing public) automatically think there is something wrong" (Tr. 201), said an investment broker.

It was also established that as far as the record was concerned, the Warren family was known to be without blot and the circumstances involved in this particular situation were of isolated occurrence. In any event, after considerable discussion with his counsel, Warren, Jr. decided to enter into the Consent Decree under very trying circumstances, including some domestic problems as well as the illness of members of his family, and he thought the attendant publicity might have an adverse effect on both situations.

In the instant situation, while there was a diversion of funds from the corporate purpose directly in contravention of the statement made to the lender, the evidence on the record suggests Warren, Jr. did not intend to violate Regulation U. He had no real reason to do so, for he, his family, and WAOC had other sufficient assets available to secure the loans or to purchase new securities. This particular point is important in the view of the Court from the standpoint of the need for the continuance of the injunction to protect the public in its evaluation of securities with which either the Warren Fund or Warren, Jr. may be involved. We thus conclude, taking all the circumstances revealed by the testimony into consideration, that the violation came more from inadvertence than from studied intent, there is very little likelihood that it will occur again, and that the injunction is causing, and will cause in the future, undue hardship through requiring disclosure which the Government admits is part of the fundamental purpose of the S.E.C.'s seeking permanent injunction, all lead the Court to the conclusion that the injunction must be set aside.

### IV. DISCUSSION.

In light of our previous determination of the applicable law and in view of the findings of fact hereinabove set forth, we will conclude with a very brief discussion.

In light of *Swift & Co., supra,* as interpreted in *United States v. United Shoe Machinery Corp., supra,* this Court concludes that the injunction previously entered by the Court for the elimination of violation of the Federal statute and Securities and Exchange Commission Regulations issued thereunder may be opened and dissolved.

*Securities and Exchange Commission v. Advance Growth Capital Corp., supra,* and

*Securities and Exchange Commission v. Jan-Dal Oil & Gas, Inc., supra.* Rule 60(b)(5) and (6) permit the Court to exercise its equitable power to adapt the injunction to events which never fully became permanent and impervious to change. *King-Seeley Thermos Co. v. Aladdin Industries, Inc., supra*; Moore, Federal Practice Vol. 7, ¶ 60.27[2] (1975).

The loans in the instant situation were each repaid within a period of approximately six months. No additional funds were ever borrowed under the commitment arranged by Warren, Sr. with Mellon Bank, and Warren, Jr. was also not involved in any further loans under that commitment. The real danger involved was that securities would be used to secure two short term commitments. If some temporary investment in marketable securities had not been made, or if more corporate stock had been requested and pledged as collateral, or if some other form of collateral had been utilized, margin regulations would have been inapplicable to the situation. Considering the assets of Warren, Jr., the Warren Foundation and WAOC, there is no suggestion from the record, except timing, that there was any motivation or intention to violate the margin requirements. The Court concludes only a technical violation is shown and there is no necessity for continuance of the Injunction. We are well aware that there is a difference of opinion on the issuance of injunctions to "obey the law" so that enforcement by administrative agencies may be sought by contempt rather than by the statutory route. *See Securities and Exchange Commission v. Thermodynamics, Inc., et al.,* 464 F.2d 457 (10th Cir. 1972), *cert. den.* 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 588 (1973). We do not decide this question here for there is no further necessity for the taking of the injunctive route.

As noted previously, the Defendants were charged with aiding and abetting violations of Section 7(d) of the Securities Exchange Act and Regulation U promulgated thereunder because of loan funds used to purchase margin securities in excess of amounts allowable under the margin restrictions. As amended on March 11, 1968, 12 C.F.R. 221.1(a), the operative and pertinent portion of Regulation U, provided as follows:

"No bank shall extend any credit to be used directly or indirectly by any person for the purpose of purchasing or obtaining any stock registered on a national securities exchange . . . in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time for stocks in Section 221.4 (the supplement to Regulation U) and as determined by the bank in good faith for credit subject to Section 221.3(s) or any collateral other than stocks."

The Regulation applies to the lending bank, and Warren, Jr. and the Warren Fund were alleged to be the aider and abettor in violation of the Regulation. *See Rochez Bros., Inc. v. Rhoades, et al.,* 527 F.2d 880, 886 (3rd Cir. 1975) and *Securities and Exchange Commission v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974). The possibilities of future violation, either of the principal offense itself or as an aider and abettor, are for all practical purposes non-existent.

We also take into consideration the adoption of Regulation X subsequent to the time of the Mellon loans. [Title 3 of the Foreign Bank Accounts Act added Section 7(f) to the 1934 Act. Act of October 26, 1970, P.L. No. 91–508, Section 301, 84 Stat. 1114]. Pursuant thereto, the Board of Governors of the Federal Reserve System promulgated Regulation X, 12 C.F.R. 224 (1972), "to prevent the infusion of unregulated credits . . . into U.S. securities markets in circumvention of the provisions of the Board's margin regulations or by borrowers falsely certifying the purpose of the loan, or otherwise certifying the purpose of the loan or otherwise wilfully and intentionally evading the provisions of those regulations."

The effect of Section 7(f) and accompanying Regulation X was to adopt all of the existing margin regulation law and extend them specifically to the borrower, thereby making implicit that the margin require-

ments did apply to borrowers. Thus, amended federal regulations have been found sufficient to justify relief under Rule 60(b). *Harrell v. Harder,* 369 F.Supp. 810 (D.Conn.1974). *Cf. Jordan v. School District of City of Erie, Pa.,* 548 F.2d 117 (3rd Cir. 1977) (a modification of a consent decree to conform to a subsequent United States' Supreme Court decision) and *Elgin National Watch Co. v. Barrett,* 213 F.2d 776 (5th Cir. 1954) (dissolution of injunction). The adoption of Regulation X subsequent to the Defendants' transactions is appropriately included as showing that administrative enforcement by a contempt procedure is not as necessary as it was at the time of the transactions.

An appropriate Order will be entered.

## APPENDIX A

### MELLON NATIONAL BANK AND TRUST COMPANY
### (REGULATION U)

### BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

### STATEMENT OF PURPOSE OF THE PROCEEDS OF A STOCK–SECURED EXTENSION OF CREDIT BY A BANK.  (FEDERAL RESERVE FORM U–1)

A FALSE OR DISHONEST STATEMENT BY THE CUSTOMER OR THE OFFICER OF THE BANK ON THIS FORM MAY BE PUNISHABLE BY FINE OR IMPRISONMENT (U.S. CODE, TITLE 15, SECTION 78ff, AND TITLE 18, SECTION 1001).

Please print or type (if space is inadequate attach separate sheet).

I (we), <u>Warren American Oil Company</u>, have applied for an extension of credit from
(name(s))
<u>Mellon National Bank and Trust Company</u> in the amount of $<u>500,000</u> secured in whole or in part
(name of bank)
by stock as follows:

Part I.  Stock Collateral

| | | | | TO BE COMPLETED BY THE BANK | |
| --- | --- | --- | --- | --- | --- |
| Stock (list separately by issue)' | Number of shares | Source of valuation | Market value (in $) | Source of valuation | Market value (in $) |
| Gulf Oil Corp. | 9,000 | NYSE 9/27/68 | 749,250 | | |

| Part II.   Other Collateral | | | | Maximum loan value under Regulation U $_____ | Total: $_____ |
| --- | --- | --- | --- | --- | --- |
| List collateral (Itemize where 10 per cent or more) | Source of valuation | Market value (in $) | Source of valuation | Market value (in $) | Good faith loan value (in $) |
| | | Total: $_____ | | Total: $_____ | Total: $_____ |
| | | | Total amount of credit granted $_____. | | |

## APPENDIX A—Continued

Part III.

1. The proceeds of this credit are to be used for <u>corporate purposes</u>
(describe in detail)

_____

_____

_____

2. I (we) have owned the stock collateral securing this credit continuously for (check one)

[XX] six months or more          ☐ less than six months.

I (WE) HAVE READ THIS FORM AND HEREBY CERTIFY AND AFFIRM THAT TO THE BEST OF MY (OUR) KNOWLEDGE AND BELIEF THE STATEMENTS REQUIRED OF ME (US) ARE TRUE, ACCURATE, AND COMPLETE.

Manual signature of customer(s): Warren American Oil Company

DATE ___September 30, 1968___          (SIGNED) W. K. Warren, Jr.
                                                 (Print name under each signature)
                                        W. K. Warren, Jr., President
                                                 (Street address)
                                        915 First National Building
                                                 (City, state)
Part IV.                                Tulsa, Oklahoma 74103

| TO BE COMPLETED BY BANK |
|---|

1. State amount of any other credit extended to the customer(s) (a) secured in whole or in part, directly or indirectly, by any portion of collateral listed in Parts I and II: $_____ and (b) unsecured credit in excess of $5,000 in the aggregate $_____ .

2. Is the collateral listed in Part I to be delivered or has the collateral been delivered from a bank, broker, dealer, or a person other than the customer? _____. Against payment? _____ .

I HAVE SUPPLIED THE INFORMATION REQUIRED OF THE BANK AND ACCEPT THE CUSTOMER'S STATEMENT ON THIS FORM IN GOOD FAITH AS DEFINED BELOW.* I AM FAMILIAR WITH THE PROVISIONS OF REGULATION U.

DATE _____          (SIGNED) _____
                                            (Print name and title of signing officer under signature)

                                            _____
                                                        (Name of bank)

* Regulation U requires that the customer's statement on this form be accepted by an officer of the bank acting in good faith. Good faith requires that such officer (1) must be alert to the circumstances surrounding the credit, and (2) if he has any information which would cause a prudent man not to accept the statement without inquiry, has investigated and is satisfied that the statement is truthful.

This form must be retained by the bank for at least six years after the termination of the credit.

APPENDIX A—Continued

MELLON NATIONAL BANK AND TRUST COMPANY
(REGULATION U)

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

STATEMENT OF PURPOSE OF THE PROCEEDS OF A STOCK–SECURED EXTENSION
OF CREDIT BY A BANK. (FEDERAL RESERVE FORM U–1)

A FALSE OR DISHONEST STATEMENT BY THE CUSTOMER OR THE OFFICER OF THE
BANK ON THIS FORM MAY BE PUNISHABLE BY FINE OR IMPRISONMENT (U.S.
CODE, TITLE 15, SECTION 78ff, AND TITLE 18, SECTION 1001).

Please print or type (if space is inadequate attach separate sheet).

I (we), <u>Warren American Oil Company,</u> have applied for an extension of credit from
(name(s))
<u>Mellon National Bank and Trust Company</u> in the amount of $<u>500,000</u> secured in whole or in part
(name of bank)
by stock as follows:

Part I.  Stock Collateral

| | | | | TO BE COMPLETED BY THE BANK | |
| Stock (list separately by issue) | Number of shares | Source of valuation | Market value (in $) | Source of valuation | Market value (in $) |
|---|---|---|---|---|---|
| Gulf Oil Corp. | 18,000 | NYSE 1/20/69 | 774,000 | | |

Part II.  Other Collateral

Maximum loan value under Regulation U $_____    Total: $_____

| List collateral (Itemize where 10 per cent or more) | Source of valuation | Market value (in $) | Source of valuation | Market value (in $) | Good faith loan value (in $) |
|---|---|---|---|---|---|
| | | Total: $_____ | | Total: $_____ | Total: $_____ |

Total amount of credit granted $_____.

## APPENDIX A—Continued

Part III.

1. The proceeds of this credit are to be used for <u>corporate purposes</u>
(describe in detail)

_____

_____

_____

_____

2. I (we) have owned the stock collateral securing this credit continuously for (check one)

☐ six months or more ☐ less than six months.

I (WE) HAVE READ THIS FORM AND HEREBY CERTIFY AND AFFIRM THAT TO THE BEST OF MY (OUR) KNOWLEDGE AND BELIEF THE STATEMENTS REQUIRED OF ME (US) ARE TRUE, ACCURATE, AND COMPLETE.

Manual signature of customer(s): WARREN AMERICAN OIL COMPANY

DATE __January 20, 1969__ (SIGNED) X_____
(Print name under each signature)

_____
(Street address)

_____
(City, state)

Part IV.

| TO BE COMPLETED BY BANK |
| --- |

1. State amount of any other credit extended to the customer(s) (a) secured in whole or in part, directly or indirectly, by any portion of collateral listed in Parts I and II: $_____ and (b) unsecured credit in excess of $5,000 in the aggregate $_____.

2. Is the collateral listed in Part I to be delivered or has the collateral been delivered from a bank, broker, dealer, or a person other than the customer? _____. Against payment? _____.

I HAVE SUPPLIED THE INFORMATION REQUIRED OF THE BANK AND ACCEPT THE CUSTOMER'S STATEMENT ON THIS FORM IN GOOD FAITH AS DEFINED BELOW.\* I AM FAMILIAR WITH THE PROVISIONS OF REGULATION U.

DATE _____ (SIGNED) _____
(Print name and title of signing officer under signature)

MELLON NATIONAL BANK AND TRUST COMPANY

\* Regulation U requires that the customer's statement on this form be accepted by an officer of the bank acting in good faith. Good faith requires that such officer (1) must be alert to the circumstances surrounding the credit, and (2) if he has any information which would cause a prudent man not to accept the statement without inquiry, has investigated and is satisfied that the statement is truthful.

This form must be retained by the bank for at least six years after the termination of the credit.