SECURITIES AND EXCHANGE COMMISSION, Appellant,

v.

William K. WARREN, Jr., and Warren Fund.

No. 77–2531.

United States Court of Appeals, Third Circuit.

Argued June 22, 1978.

Decided Sept. 1, 1978.

Harvey L. Pitt, Gen. Counsel, Paul Gonson, Associate Gen. Counsel, Frederick B. Wade, Sp. Counsel, Barbara N. Brandon, Atty., Securities and Exchange Commission, Washington, D. C., for appellant.

Frank L. Seamans, Wm. Alivah Stewart, III, James H. Roberts, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellees.

Before SEITZ, Chief Judge, and ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal by the Securities and Exchange Commission ("the Commission" or "SEC") is from an order of the district court for the Western District of Pennsylvania dissolving a permanent injunction entered by consent against William K. Warren, Jr., and the Warren Fund, appellees, restraining them from future violations of the margin requirements of the Securities and Exchange Act, 15 U.S.C. § 78g(d), and Regulation U promulgated thereunder.

### I.

On November 15, 1973, the Commission filed an injunctive action against the defendant, William K. Warren, Jr., president of the Warren American Oil Co. ("WAOC") since 1956 and defendant, Warren Fund ("the Fund"), a limited partnership Warren had organized to conduct an investment business in securities. The suit sought to enforce the margin requirements contained in section 7(d)[1] of the Securities Exchange Act of 1934 ("the Act") and Regulation U.[2]

In its complaint, the Commission alleged that on or about September 30, 1968, Warren obtained a three million dollar line of credit from a bank ostensibly for the use of WAOC; that on or about October 1, 1968, and January 20, 1969, he caused WAOC, a company he controlled, to borrow $1,000,000 against that line of credit in two transactions, each involving a $500,000 loan; that the two loans were secured by a pledge of margin securities; and that Warren represented on two statements (Federal Reserve Form U–1, Statement of Purpose of a Stock-Secured Extension of Credit by a Bank) required by law that the funds would be used for "corporate purposes" of WAOC whereas in fact the proceeds of the loans were to be used for the purchase of securities. Relying on its investigation which indicated that none of the borrowed funds had been used for the benefit of WAOC, the SEC alleged that, after misrepresenting the purpose of the loans, Warren transferred the funds through various conduits to the defendant Fund where the money was used to purchase margin securities in excess of the amounts allowable under the margin restrictions of the federal securities laws. Because of this conduct, SEC charged the defendants with aiding and abetting viola-

---

1. Section 7(d) of the Securities Exchange Act, in effect at the time of the alleged violations, provided in pertinent part:

    (d) It shall be unlawful for any person . . . to extend or maintain credit or to arrange for the extension or maintenance of credit for the purpose of purchasing or carrying any security, in contravention of such rules and regulations as the Federal Reserve Board shall prescribe to prevent the excessive use of credit for the purchasing or carrying of . . . securities . . . ..

15. U.S.C. § 78g(d).

2. At the time of the alleged violations, Regulation U provided in pertinent part:

    No bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any stock registered on a national securities exchange . . . in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time . . . ..

12 C.F.R. § 221.1(a).

tions of the margin requirements of section 7(d) of the Act.[3]

Each of the defendants immediately filed consents to the Final Judgment of Permanent Injunction which, with the exception of jurisdictional questions, constituted neither an admission nor denial of the allegations of the complaint. The consents agreed to the entry of a permanent injunction but provided that they were not to constitute any evidence nor any admission with respect to any issue or of any wrongdoing or liability for any purpose. The district court thereupon entered on November 15, 1973, without a hearing, its final judgment of permanent injunction. On January 27, 1977, the defendants moved to dissolve, suspend, or modify the permanent injunction pursuant to subsections (5) and (6) of Rule 60(b) of the Federal Rules of Civil Procedure.[4]

The motion requested, in the alternative, that the operation of the injunction be suspended "pending the outcome of a full and complete trial on the merits of the allegations contained in plaintiffs' complaint . . . ." In support of their motion, the defendants asserted, *inter alia,* that the promulgation of Regulation X subsequent to the time the violations occurred, but prior to the entry of the injunction, is sufficient to protect the investing public from future violations; that the mandatory prohibitions of the final injunction are, therefore, no longer necessary because of the subsequent change in the securities law which forbade the very conduct previously enjoined; and that the continued existence and prospective application of the injunction constituted an extreme hardship and unreasonable burden on Warren, Jr. The Commission

filed a number of motions to dismiss which were denied and the cause came on for evidentiary hearing before the district court to determine

[w]hether or not it is any longer equitable to continue the injunction or whether just reasons exist for its dissolution . . . .

Judge Snyder specifically directed that the hearing would not consider assertions that there was no violation of the federal securities laws at the time the injunction was issued. He permitted, however, background testimony and set forth the circumstances underlying the violations in his opinion, *Securities & Exchange Commission v. Warren,* 76 F.R.D. 405 (W.D.Pa.1977), and they do not require repetition.

The district court found the following facts pertinent to the issues raised on appeal. Both loans were repaid in approximately six months. No additional funds were ever borrowed by Warren, Jr., under the loan commitment with the Mellon Bank. Subsequent to the entry of the consent decree, an addition became necessary to the St. Francis Hospital in Tulsa, Oklahoma, which required in excess of $8,000,000 of public bonds. The St. Francis Hospital, costing over $11,000,000, was the product of the Warren Foundation founded by William K. Warren, Sr., and his wife. Because defendant Warren, Jr., was president of the Foundation at the time of the proposed bond issue, financial advisors indicated that the Commission should either remove the permanent injunction or offer some relief so that Warren, Jr., or the Foundation would not be required to disclose on the bond prospectus the outstanding permanent injunction against Warren, Jr., and the Fund. In order to expedite the hospital

---

**3.** Regulation U only applied to lending banks at the time of the alleged misconduct. Individual borrowers who participated in violations of section 7 and regulation U were liable only as aiders and abettors. Subsequently, but prior to the entry of the injunction, new subsection 7(f) was added to the Act and implemented by the promulgation of Regulation X, 12 C.F.R. § 224 (1972), which made borrowers directly liable for falsely certifying the purpose of a loan on Form U–1 or otherwise willfully and intentionally evading the margin regulations.

**4.** Rule 60(b) provides in pertinent part that a district court may grant relief from a final judgment if, *inter alia*:

(5) . . . it is no longer equitable that the judgment should have prospective application; or

(6) [there is] any other reason justifying relief from the operation of the judgment.

funding, Warren, Jr., resigned as chairman of the Foundation Board in July 1975, and the bonds were issued in January 1976.

The district court also found Warren had been a director of the Williams Companies, a corporation listed in the New York Stock Exchange, and had resigned in 1973 because of the SEC investigation then being conducted. He was also a director of the First National Bank and Trust Co. of Tulsa, Oklahoma, and resigned from its trust committee to avoid embarrassment because the committee dealt with stocks and bonds of the trusts it administered. Warren, Jr., was also a director of the Sooner Federal Savings and Loan Association of Tulsa and because it was contemplating going public, he also felt compelled to resign in August, 1974.

The district court found that although there was a diversion of funds in contravention of the statement made to the lender, the evidence suggests that Warren, Jr.

did not intend to violate Regulation U. He had no real reason to do so, for he, his family, and WAOC had other sufficient assets available to secure the loans or to purchase new securities.

*Securities & Exchange Commission v. Warren*, 76 F.R.D. at 411.

The district court concluded: the violation was technical and there was little likelihood of recurrence; that the permanent injunction was causing and would in the future cause undue hardship; that since the Mellon loans to the defendant, Regulation X has been promulgated, 12 C.F.R. § 224 (1972), the effect of which was to adopt all of the existing margin regulation law and extend it specifically to the borrower. Thus, the district court held that adoption of Regulation X reduced the need for administrative enforcement of the margin regulation law by injunction and contempt procedure. Accordingly, the court entered an order under Rule 60(b) on August 29, 1977, granting defendant's motions and dissolving the permanent injunction. We affirm.

## II.

The issues on appeal as framed by the appellants are:

(1) Did the district court abuse its discretion by dissolving the permanent injunction?

(2) Did the decision of the district court constitute a ruling *de novo* on the merits of the Commission's original complaint?[5]

The Commission contends that under *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), the appropriate standard for vacating an injunction is "[n]othing less than a clear showing of a grievous wrong evoked by new and unforeseen conditions . . . ." *Id.* at 119, 52 S.Ct. at 464. The Commission argues that the district court abused its discretion by dissolving the injunction, and claims that the Supreme Court and other appellate decisions such as *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932); *Securities & Exchange Commission v. Advance Growth Capital Corp.*, 539 F.2d 649 (7th Cir. 1976); *SEC v. Jan Dal Oil & Gas, Inc.*, 433 F.2d 304 (10th Cir. 1970); and *Humble Oil & Refining Co. v. American Oil Co.*, 405 F.2d 803 (8th Cir.), *cert. denied*, 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969), require a clear showing of grievous wrong evoked by new and unforeseen conditions before an injunction may be dissolved and that the petitioners bear a heavy burden of proof.

---

**5.** We find no merit to the Commission's secondary contention that the district court exceeded the permissible bounds of its discretion by going behind the consent decree and impeaching the injunction on basis of conditions that existed at the time the decree was entered. We agree that it would have been improper for the district court to review the merits in granting the original injunction. However, in granting the evidentiary hearing, the district court, as we have already observed, promptly noted that "[s]uch a hearing will not, however, include assertions that there was no violation of the Federal securities laws at the time the injunction was ordered." The district court received evidence of the nature and background of the loan transaction merely for the purpose of assessing the scope and magnitude of the original violation in order to properly weigh the necessity for the continuance of the injunction.

They also rely on *Mayberry v. Maroney*, 558 F.2d 1159 (3d Cir. 1977), where this court reversed an order of the district court on the ground that it abused its discretion in granting relief from a consent injunction. Relying on *Swift, supra*, we held that the party seeking relief must bear a heavy burden of showing circumstances so changed that dangers once substantial have become severely attenuated and that absent such relief extreme and unexpected hardship will result.[6]

The defendants respond to this argument contending that the applicability of the *Swift* standard has been limited by *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), and *King Seeley Thermos Co. v. Aladdin Industries, Inc.*, 418 F.2d 31 (2d Cir. 1969). They claim that the teaching of the Supreme Court in *United Shoe* is that *Swift*'s strict standards were forged in response to a unique and severe economic threat and were not to be mechanically applied to all applications for relief from injunctive decrees. They further contend that the continued existence of prospective application of the permanent injunction constitutes an extreme hardship, an unreasonable burden, and is a serious impediment to Warren's business activities; that the continued application of the injunction serves no useful purpose, especially when weighed against the inequities resulting from its continuation.

The decrees in *Swift*, entered after years of litigation against the nation's five leading meat packers, enjoined an unlawful monopoly of a large part of the food supply of the nation from entering into or continuing any combination in restraint of trade. Although the decree had been entered upon consent the Supreme Court in *Swift* noted that it was not accepted by the defendants as a definitive adjudication but it was thereafter subjected to "vigorous assault."

286 U.S. at 112, 52 S.Ct. 460. Recognizing the power of a court of equity to modify an injunction in adaptation to changed conditions, the Court concluded that under the unique facts of the case before it only a "clear showing of grievous wrong evoked by new and unforseen conditions," 286 U.S. at 119, 52 S.Ct. at 464, should lead to a modification of what was decreed "after years of litigation." *Id.* After analyzing the reasons upon which the original complaint was predicated, the Court was persuaded that the same conditions and concerns that compelled the original decree remained undiminished.

> We have said that the defendants are still in a position, even when acting separately, to starve out weaker rivals, or at least that the fear of such abuses . . . is still rational today. . . . Size and past aggressions leave the fear unmoved today.

286 U.S. at 117, 52 S.Ct. at 463.

The Court was thus realistically apprehensive, particularly in light of the defendants' past aggressive and abusive conduct. It perceived that the defendants were still in a very realistic position to perpetrate their monopolistic and other unlawful practices unless the injunctive restraints were continued. The Court's considerations in rejecting modification of the injunction must be viewed in the context of the unusual conditions before it, the public interest, and the perceived continuing danger to the nation's economy.

Perspective on the limitation of the *Swift* standard is provided in *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), and *King Seeley Thermos Co. v. Aladdin Industries*, 418 F.2d 31 (2d Cir. 1969). In *United Shoe*, the Supreme Court reversed the district court's stringent denial of the Government's petition to modify the prior decree on the basis of the *Swift* standard. In

---

**6.** In *Mayberry v. Maroney, supra*, the Commonwealth of Pennsylvania consented to be enjoined from confining any prisoners in a basement facility known as the Behavior Adjustment Unit. Not long afterward the Commission sought dissolution of the injunction under Rule 60(b) without showing any facts indicating any entitlement to relief. No evidence was adduced showing that the physical conditions existing in the Behavorial Unit had been improved from the time the court entered the decree.

holding that the district court had "misconceived the thrust of [the] Court's decision in *Swift*," 391 U.S. at 248, 88 S.Ct. at 1499, the Court in *United Shoe* reviewed the grave apprehensions and hard economic realities behind the *Swift* decision.

> After reviewing the evidence, the [Swift] Court concluded that the danger of monopoly and of the elimination of competition which led to the initial government complaint and the decree had not been removed and that, although in some respects the decree had been effectuated, there was still a danger of unlawful restraints of trade. . . .

*Id.* The Court in *United Shoe* also characterized the holding in *Swift* to be the following:

> *Swift* teaches that a decree may be changed upon an appropriate showing, and it holds that it may *not* be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly and restrictive practices) have not been fully achieved.

In *King Seeley Thermos Co., supra*, Judge Friendly held that although the power to modify an injunction should be exercised sparingly, "there is power to modify an injunction even in the absence of changed conditions." 418 F.2d at 35. In that trademark dispute, the district court had refused to modify the injunctive decree on the basis of *Swift*. Judge Friendly in reversing expressed the view that the district court had given the *Swift* decision a "rigidity the Court did not intend," *id.* at 34, and concluded:

> While changes in fact or in law afford the clearest bases for altering an injunction, the power of equity has repeatedly been recognized as extending also to cases

where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes.

*Id.* at 35.

Turning to the facts of the instant case, the Commission argues that the evidence adduced by Warren, Jr., reveals nothing more than personal embarrassment over a potential disclosure requirement of which he was forewarned prior to the consent decree.[7] The defendants responded that the record is replete with evidence of changed circumstances and the absence of any continuing danger of defendant's unlawful conduct. They argue also that although neither the injunction nor the Commission literally require Warren, Jr., to resign from corporate offices or directorships held by him, the overall effect of the injunction has in reality compelled it.

■ Under Rule 60(b), relief from judgment is directed to the discretion of the trial court, and its exercise of that discretion will not be disturbed unless there was clear error and abuse of discretion. *Girard Trust Bank v. Martin*, 557 F.2d 386 (3d Cir.), *cert. denied*, 434 U.S. 985, 98 S.Ct. 612, 54 L.Ed.2d 479 (1977); *Virgin Islands National Bank v. Tyson*, 506 F.2d 802 (3d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

The district court began its analysis of the evidence by assessing, as did the Court in *Swift*, the nature of the original violation in order to weigh the facts to be considered in determining the prospective need for continuing the original injunction.

■ It is evident that the type of conduct enjoined in the instant case—described by the district court as a technical violation of

---

7. Whether the effects of disclosure requirements were foreseeable may be answered by the sharp dispute between the experts on SEC regulations produced by both the defendants and the Commission. None of them seemed to be able to state with certainty when disclosure would be required under the permanent injunction in registration or proxy statements. Toomey, a staff member of the Commission, testified that even at staff level the need for disclo-

sure could not be determined "without having a disclosure document and the necessary analysis." On the other hand, Warren, Jr., points out that he could not have predicted that St. Francis Hospital would decide to issue bonds (to be guaranteed by the Foundation) or that the Sooner Federal Savings and Loan Association would go public, which would require the prospectus of each to disclose the outstanding injunction against director Warren, Jr.

the margin requirements intended to contain credit—in no way approaches the outrageous conduct enjoined in *Swift*. The monopolistic misconduct enjoined in *Swift* not only affected the nation's economy, but the injunction was aggressively resisted by the defendants after the decree and the defendants had the position and power at the time modification was sought to continue to perpetrate their objectionable conduct.

In the instant case, we have a single isolated offense in an esoteric area of the law. The violation committed was voluntarily undone by repayment of the loans within six months and never again renewed. In view of the assets available to Warren, Jr., and to WAOC for collateral to completely comply with the existing marginal requirements, it is difficult to ascribe any motive for the violation.

The circumscribed misconduct of the defendants is reflected in the narrow thrust of the injunctive decree—restraining them from filing a Form U–1 pursuant to Regulation U which is false, misleading, and does not accurately reflect the purpose of the loan, or obtaining credit for the purpose of purchasing any margin security in excess of the *amounts allowable under margin restrictions* of the federal securities laws. Unlike *Swift*, the defendants here have not resisted the injunction but have continuously submitted to it. Unlike *Swift*, there is no great public or national interest to be served by an injunction in essence against a single individual.[8] Unlike *Swift*, the elimination of the improper practice and the purpose of the injunction appear to have been fully achieved.

In effect, the injunction merely requires defendants "to obey the law" in the future when obtaining loans for the purchase of margin securities, a requirement with which they must comply regardless of the injunction. Dissolution of the injunction decree removes the possibility of contempt proceedings in the event of a future violation; the right to prosecute criminally or proceed civilly still exists.

Motions to dissolve an injunction are addressed to the sound discretion of the district court and its resolution of the matter will not be disturbed on appeal in the absence of an abuse of discretion. "A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *United States v. Swift & Co., supra*, 286 U.S. at 114, 52 S.Ct. at 462.

In weighing the convenience of enforcing a future violation by contempt proceedings, we must also determine whether in the present circumstances and the state of the law the decree works extreme and unnecessary hardship upon the defendants.

First, we note that there has been a change in the regulations since the violation. Regulation X of the Federal Reserve Board [9] makes borrowers, as distinguished from previous margin regulations applicable only to a lender, directly liable for intentionally evading margin regulations.

Second, Warren, Jr., felt compelled because of the injunction to resign from various corporate activities. In May 1974 he resigned from the trust committee of the First National Bank & Trust Co. of Tulsa. In August 1974 he resigned from the Board of Sooner Federal Savings and Loan Association. In June 1975 he did not stand for reelection to the William K. Warren Foundation Board.

The district court found that the "Warren family was without blot" and this violation was an isolated occurrence. Judge Snyder concluded: (1) that taking all the circumstances "the violation came more from inadvertence than from studied intent"; (2) there is very little likelihood that it will occur again; (3) only a technical violation is shown and there is no necessity

---

8. The Warren Fund was liquidated in 1973.

9. Title III of the Foreign Bank Acc'ts Act added section 7(f) of the Securities Exchange Act of 1934. Act of October 26, 1970, Pub.L. No. 91–508, § 301, 84 Stat. 1124. Pursuant thereto, Regulation X was adopted, 12 C.F.R. § 224 (1972).

for continuance of the injunction; and (4) the injunction is causing, and will cause, undue hardship.[10]

Approximately ten years have elapsed since Warren, Jr., committed the violation. Almost five years have elapsed since the consent decree was entered. During this entire period there has been no evidence of any recurrence of any violation. The violation itself was of very limited duration. In the meantime, it is evident that Warren, Jr., has suffered personal humiliation and business embarrassment. He has resigned from corporate boards and he has been foreclosed as a candidate from at least one important directorship. Warren, Jr., also testified that he has been precluded from several substantial business opportunities. Moreover, the district court concluded that the change in regulations has diminished the need for administrative enforcement by contempt. In light of these circumstances, we cannot say that the district court abused its discretion in concluding that there is no further necessity for the permanent injunction.[11]

Although the record here does not warrant us in concluding that the district court abused its discretion, we nevertheless express our awareness of the importance of injunctions in enforcing the Act and, in consequence, they are not to be lightly vacated.

Accordingly, the order of the district court will be affirmed.

---

**10.** Apparently, the injunction once issued does have significant residual effects under the federal securities laws even if dissolved. The Commission asserts that even if the court were to raise or lift the injunction, disclosure of its previous existence may be necessary, and the facts surrounding its dissolution if material to investors should Warren, Jr., become an officer or director of a public corporation.

**11.** In *SEC v. Thermodynamics, Inc.*, 464 F.2d 457 (10th Cir. 1972), the court of appeals held the district court did not abuse its discretion in

refusing to vacate an injunction. It observed, however, that

> [I]n instances where the defendant concerned is an individual, and where the alleged violation leading to the injunction was an incident of limited scope or duration, the passage of a substantial period of time with full compliance and with no other violations may be regarded as a significant factor showing a "change" for these purposes.

*Id.* at 461.