### SECURITIES AND EXCHANGE COMMISSION

v.

### John H. CLIFTON, Appellant.

### No. 82–1486.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 19, 1983.
Decided Feb. 25, 1983.

Joseph E. Schuler, Washington, D.C., with whom David M. Barrett, Washington, D.C., was on the brief, for appellant.

Linda D. Fienberg, Associate Gen. Counsel, S.E.C., Washington, D.C., with whom Benjamin Greenspoon, Deputy to the Associate Gen. Counsel, Whitney Adams, Asst. Gen. Counsel, Jeffrey B. Maletta, Attorney, and Paul Gonson, Sol., S.E.C., Washington, D.C., were on the brief, for appellee.

Before WALD, MIKVA and BORK, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

Appellant, John H. Clifton, seeks reversal of a district court order denying his motion to dismiss or modify a 1976 consent decree entered into with the Securities and Exchange Commission ("SEC"), enjoining him from violating certain antifraud provisions of the federal securities laws.[1] In the district court, 540 F.Supp. 848, Clifton, who was engaged in selling partnership interests in oil and gas exploration and development programs at the time he signed the consent decree, sought to have the court exercise its equitable discretion under Fed.R.Civ.P. 60(b)(5) or (6) to dismiss or modify the decree. He argued that the decree had caused him "grievous wrong" and undue hardship by rendering him totally unable to engage in his former business, that he had not foreseen such a result at the time he signed the decree, that he had faithfully complied with the SEC's antitrust disclosure requirements since entry of the decree, and that, because his past violations were isolated, technical transgressions, he was unlikely to violate the securities laws in the future. The district court denied Clifton's motion, finding that the consent decree had no bearing on Clifton's ability to conduct his business affairs, that investors were deterred from investing with Clifton for a variety of reasons other than the decree, and that Clifton's net worth had steadily increased since 1976. As a result, the court held that Clifton had failed to meet the standard set out in *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), for relieving a party from a consent decree, which requires that the defendant must make " 'a clear showing of grievous wrong evoked by new and unforeseen conditions' " before a decree will be dissolved. We affirm.

## I. BACKGROUND

In the late 1970s Clifton organized several oil and gas exploration partnerships, including "J.C. Oil. Ltd" (the "1973 program"), "J.C. Oil, Ltd.–1974" (the "1974 program"), and "J.C. Oil, Ltd.–1975 A and B" (the "1975 program"), in which he sold limited partnership interests. Because

---

**1.** Specifically, the decree enjoined Clifton from violating § 17(a) of the Securities Act, 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b); and Rules 10b–5 and 10b–9, 17 C.F.R. §§ 240.10b–5 and 240.10b–9 (1982), thereunder.

these programs were public offerings, Clifton was required to file registration and proxy statements with the SEC.

After the 1973 and 1974 programs had been fully subscribed, become fully effective, and begun to operate, but before the 1976 program became effective, Clifton learned from an auditor that he might have violated the securities laws. He thereupon informed the SEC of the possible violations. On February 6, 1976, the SEC filed a complaint in the district court, seeking to enjoin Clifton from making certain misrepresentations in his SEC filings. Specifically, the complaint charged that, contrary to representations in the registration statements and prospectuses, Clifton had (1) failed to conduct one of his offerings on an appropriate "all-or-none" basis,[2] and had withdrawn his own investment in one of the partnerships after the minimum capital requirement had been met with other investors' money; (2) represented that no commitments had been made on behalf of the partnerships to any ventures, when in fact he had committed the partnerships to investments in particular oil and gas wells, two of which proved to be dry holes prior to completion of the offering; and (3) misrepresented the tax advantages in one of the offerings.

Before the SEC filed its complaint, it negotiated a settlement of the action with Clifton which required that he consent to a decree (without admitting or denying the allegations of the complaint) enjoining him from violating the antifraud provisions of the securities laws in the future. In addition, the SEC required Clifton to reimburse one of the partnerships for money improperly charged to it and delayed the effectiveness of Clifton's registration with the SEC as a broker-dealer for sixty days.

On January 26, 1981, Clifton moved under Fed.R.Civ.P. 60(b)(5) and (6) to dissolve or amend the 1976 consent decree. On March 3, 1982, the district court denied Clifton's motion. This appeal followed.

## II. ANALYSIS

■ Fed.R.Civ.P. 60(b)(5) and (6)[3] provide that a district court may, in its discretion, grant relief from a final judgment or order if it is no longer equitable that the judgment should have prospective application, or if there is any other reason justifying relief. The exercise of the district judge's discretion will not be disturbed unless there has been abuse of that discretion. *GAF Corp. v. Transamerica Insurance Co.,* 665 F.2d 364, 370 (D.C.Cir.1981).

Clifton argues that Rule 60(b) is a rule of equity, that it is specifically designed to encourage flexibility, and that it requires that each case be judged on its own facts and circumstances. He therefore contends that neither *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999, which looked to "grievous wrong" evoked by "new and unforeseen conditions," as the determinant of whether the injunction in question should be dissolved, nor *SEC v. Warren,* 583 F.2d 115 (3d Cir.1978), which looked to several factors peculiar to that case in deciding that the injunction should be dissolved, sets out an immutable standard for dissolution of injunctions that should be applied mechanically to all other cases;[4] instead, he urges that *Swift* and

---

**2.** In an "all or none" offering, the issuer represents that, if a minimum amount of securities is not sold within a specific time, all funds obtained from investors will be refunded. *See Securities and Exchange Commission v. Coven,* 581 F.2d 1020, 1022 (2d Cir.1978), *cert. denied,* 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979).

**3.** Rule 60(b)(5) and (6) provide:
　(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order,

or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

**4.** In *Swift,* a 1920 decree enjoined the nation's five leading meat-packing companies, which had combined to monopolize a large part of the country's food supply, from entering into or continuing any combination in restraint of

*Warren* are simply applications of the same broad equitable principle of fairness to different factual settings.[5]

Based on the particular factual setting of his case, Clifton contends that the district court should have exercised its discretion under Rule 60(b) to dissolve the injunction. He points out, for example, that the existence of the decree has had catastrophic results on his professional life totally unforeseen by him at the time the decree was entered; he is now, he alleges, entirely unable to engage in his former business, heavily in debt, prevented from interesting other investors in his programs, unable to borrow money, forced to liquidate assets he would not otherwise have sold, and suffering humiliation and embarrassment in his local community. He also points out that the violations he committed were technical and inadvertent, that he voluntarily informed the SEC of the violations, that he has faithfully complied with the SEC's anti-fraud disclosure requirements since the decree's entry, and that he has never before or since been charged with violating the securities laws or committing other fraud. In addition, he contends, he will continue to suffer grievous harm in the future. Although internal SEC rules only required him to disclose the existence of the decree in registration and proxy statements for five years after the decree was entered in 1976, *see* 17 C.F.R. § 229.20, Item (3)(f)(3) (1982), disclosure of the injunction as material information in other contexts may be compulsory,[6] and future investors may be able to sue for nondisclosure even after five years if the decree is still in place.

■ Whatever standard is applied to the facts of this case, whether it be *Swift's* "clear showing of unforeseen and grievous harm," the factors delineated in *Warren,* or

trade. A decade later, two of the five companies sought to have the decree modified in light of changes in the food industry. The Supreme Court refused to allow modification of the decree, stating that the same conditions and concerns that had compelled the original degree remained undiminished and necessitated the continuance of the injunction:

> We have said that the defendants are still in a position, even when acting separately, to starve out weaker rivals, or at least that the fear of such abuses ... is still rational today.... Size and past aggressions leave the fear unmoved today.

286 U.S. at 117, 52 S.Ct. at 463. Although the Court realized that the defendants would no doubt be better off if the injunction were relaxed, it concluded that they were not

> suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

286 U.S. at 119, 52 S.Ct. at 464.

*Warren* involved a permanent injunction issued against William K. Warren, Jr., and the Warren Fund, a limited partnership organized by Warren, which used funds improperly transferred from the Warren American Oil Co., of which Warren was president, to purchase securities in violation of the margin requirements of the Securities Exchange Act. The injunction, like Clifton's consent decree, merely required Warren to refrain from violating the securities laws in the future.

The district court dissolved the injunction. On appeal, the Third Circuit held that, while it was aware of the importance of injunctions in enforcing the Securities Act and was not prepared to have them "lightly vacated," the district court had not abused its discretion. 583 F.2d at 122. It based this decision on several factors: (1) the case involved a single, isolated offense in an esoteric area of the law that was unlikely to be repeated; (2) the violation came more from "inadvertence" than from "studied intent"; (3) the violation committed was voluntarily undone by repayment of the loans and never again renewed; (4) the defendants did not resist the injunction but continuously submitted to it; (5) unlike *Swift,* no great public or national interest was served by an injunction in essence against a single individual; (6) the elimination of the improper practice and the purpose of the injunction appeared to have been fully achieved; (7) the regulations regarding the violation had changed since the injunction was entered; and (8) the injunction was causing, and would continue to cause, undue hardship to the defendants. *Id.* at 121–22.

5. At the same time, Clifton also argues that the facts and circumstances of his case closely parallel those of *Warren* and that the district court here should have followed the *Warren* district court's lead by dissolving the injunction.

6. *See SEC v. Warren,* 583 F.2d at 120 n. 7 (noting uncertainty about when disclosure of injunction would be required in certain situations).

general equitable notions,[7] it is clear that Clifton has not made a sufficient showing of real harm to overcome the government's interest in continuing the antifraud order in place. After holding two days of evidentiary hearings, the district court concluded that the existence of the consent decree had no bearing on Clifton's ability to conduct his business affairs. The court found that there were several other reasons why investors chose not to invest in Clifton's oil and gas partnerships, among them the poor operating results of his prior programs, his lack of training and experience in the oil and gas business, dissatisfaction of prior investors with his programs, his failure to communicate timely tax information and annual audited financial statements to his investors, his decision to charge a 7% commission in addition to previously assessed charges, and other factors making his ventures high-risk investments. The court also found that, far from being "put out of business" by the consent decree, Clifton's net worth increased from $373,000 in 1976 (shortly after the decree was entered) to $4,204,605 in 1981 (shortly before Clifton moved to dismiss or modify the decree).

In contrast, the SEC points out, significant governmental interests would be impaired if courts too readily lifted injunctive sanctions against violators after a few years of compliance. Because of its limited resources, the SEC has traditionally entered into consent decrees to settle most of its injunctive actions. Appellee's Brief at 25. Indeed, as the government pointed out at oral argument, over 90% of the SEC's cases are resolved by such decrees. While it gives up a number of advantages when it proceeds by injunction rather than by litigation, including the filing of findings of fact and court opinions clearly setting forth the reasons for the result in a particular case, the SEC is thus able to conserve its own and judicial resources; to obtain contempt remedies, including fines and prison terms, not available to it under its own statutory scheme; and to protect the public by informing potential investors that a certain person has violated SEC rules in the past and by reminding defendants that they must obey the law in the future. While the defendants in such cases give up the right to contest the need for an injunction, they receive significant benefits in return: they are permitted to settle the complaint against them without admitting or denying the SEC's allegations and they often seek and receive concessions concerning the violations to be alleged in the complaint, the language and factual allegations in the complaint, and the collateral, administrative consequences of the consent decree. *Id.* at 25–26. We are reluctant to upset this balance of advantages and disadvantages and require the dissolution of such consent decrees years after they were originally entered unless it is clearly inequitable for the decree to continue in effect.

Clifton has urged nothing on appeal that convinces us that the district court abused its discretion in finding that continuation of the decree was necessary to accomplish its initial purposes, that it "*was not a bar to any activities contemplated by Clifton,*" and that it provided positive protections for future investors in Clifton's ventures. Joint Appendix at 10 (emphasis in original). Accordingly, the judgment of the district court is

*Affirmed.*

---

**7.** Although the district court used the *Swift* standard in deciding the case, it also noted that it would have reached the same result if it had followed *Warren*'s "less stringent standard." Joint Appendix at 13.