TJOFLAT, Circuit Judge,
specially concurring:
I agree wholeheartedly with the majority’s analysis in this case. I write separately, however, to emphasize a more fundamental error made by the district court. I believe that many provisions of the injunction entered by the district court were entered in violation of basic principles of equity jurisprudence and constitutional law — namely, the principle that equity will not intervene where there is an adequate remedy at law and the constitutional principle of separation of powers. These principles, for reasons that will be explained hereafter, lead to the conclusion that a court should not enter an injunction that cannot be enforced through coercive contempt sanctions. Some of the injunctive provisions at issue here cannot be so enforced, and therefore must be vacated.[1]
In part I of this concurrence, after recognizing that injunctions are enforced through contempt sanctions, I discuss the types of contempt sanctions generally available to a judge. I then explain that the types of contempt sanctions available to address a violation of a particular injunction depend on the nature of the injunction; not all types of sanctions are available for all injunctions. Finally, I explain why, based on equitable and constitutional considerations, an injunction should be entered as a form of relief for a party to a lawsuit only when one type of contempt sanction — coercive—is potentially available for violations. Part II then applies this rule to the facts of this case.
I.
Injunctions are enforced through contempt sanctions. See 18 U.S.C. § 401(3) (1994). When it comes to a judge’s attention that an individual may not be in compliance with an injunction he has entered, he holds a “show cause” hearing at which the allegedly noncomplying individual is asked to show cause why he is disobeying the injunction. If the individual is in fact disobeying the injunction, and he is unable to provide an acceptable excuse for doing so, then he is subject to the contempt powers of the court.[2] In this part, I discuss the types of contempt sanctions available to a court, and then discuss how this should impact the court’s decision whether to grant injunctive relief in the first instance.
A.
Contempt sanctions take one of three forms: punitive, compensatory, or coercive. Punitive sanctions punish the contemnor for his conduct, and are imposed for the purpose of vindicating the authority of the court. See Gompers v. Buck’s Stove & Range Co., 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911).[3] For instance, if an individual is served with a *1267 subpoena duces tecum but refuses to produce the requested documents, and the court subsequently holds him in contempt and imposes a flat fine of $50 (payable to the court) for his contempt, the contempt sanction is properly classified as punitive. See Penfield Co. of Cal. v. SEC, 330 U.S. 585, 592-93, 67 S.Ct. 918, 922, 91 L.Ed. 1117 (1947). In such a situation, the opposing party is provided no relief, because it gets neither the requested documents nor the proceeds from the fine. Furthermore, the eontemnor has no way to purge the contempt (in other words, avoid the fine); if he produced the requested documents five minutes after the court’s decision, he would still be required to pay $50. The sanction in such a ease is intended to punish the eontemnor for his contempt, thereby vindicating the court’s authority and thus deterring the eontemnor and others from violating subsequent judicial orders (issued by the same or any other court). Punitive sanctions are criminal in nature and therefore many of the constitutional protections available in criminal proceedings — including the presumption of innocence, the privilege against self-incrimination, the right to counsel, and the right to a jury trial in serious cases — must be provided to the alleged eontemnor before such sanctions can be imposed. See Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 798-99, 107 S.Ct. 2124, 2133, 95 L.Ed.2d 740 (1987).[4]
The second form of contempt sanction is compensatory. Compensatory sanctions are civil in nature and compensate the plaintiff for the damage caused by the contemnor’s contempt. See United States v. United Mine Workers of Am., 330 U.S. 258, 303-04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). The contempt sanction in the well-known case of Jones v. Clinton, 36 F.Supp.2d 1118 (E.D.Ark.1999), falls into this category. In that case, the court, having found that the defendant gave false deposition testimony, held the defendant in contempt. The punishment for the contempt was a payment to the plaintiff of the expenses (including attorney’s fees) caused by the false testimony. See id. at 1134-35. Compensatory sanctions, unlike punitive sanctions, provide a direct benefit to the plaintiff. Like punitive sanctions, however, the eontemnor is unable to purge his contempt: Were President Clinton now to amend his deposition answers to make them completely accurate, the contempt sanctions would nevertheless remain in force.
The third form of contempt sanction is coercive. Coercive sanctions are also civil in nature, and are intended to coerce the eontemnor into doing an act that he is already required to do, but refuses to perform. See Gompers, 221 U.S. at 441-42, 31 S.Ct. at 498. Thus, to use the previously cited example from Penfield, if the district court had ordered the recipient of the subpoena duces tecum to pay a fine of $50 per day for every day the recipient failed to produce the requested documents, such a sanction would be coercive.[5] Coercive sanctions benefit the plaintiff by pressuring the defendant into performing an action that the plaintiff desires to have performed. See id. at 442, 31 S.Ct. at 498. They also give the eontemnor the opportunity to purge his contempt: The punishment continues only as long as the contem-nor refuses to comply with the relevant *1268 court order. Hence, in regard to coercive sanctions, it is often said that a contemnor carries the key to his prison in his own pocket. See, e.g., Blalock v. United States, 844 F.2d 1546, 1559 (11th Cir.1988) (Tjoflat, J., specially concurring) (quoting In re Nevitt, 117 F. 448, 461 (8th Cir.1902)).
The lines separating each type of sanction from the others are not always clear. Consider a situation in which a court imposes a $150 contempt sanction on a party, payable to the adverse party but in no way correlated to the harm suffered by that party. The fact that the sanction is payable to the adverse party (and not the court) makes the sanction appear compensatory, but the fact that the amount of the sanction is unrelated to the harm suffered by the adverse party leads to the conclusion that the sanction is in fact punitive. Cf. Thyssen, Inc. v. S/S Chuen On, 693 F.2d 1171, 1173-74 (5th Cir.1982). Furthermore, every contempt sanction serves to some degree to vindicate the authority of the court (and thus is somewhat punitive) and to dissuade the contemnor from repeating his misbehavior (and thus is somewhat coercive). See Gompers, 221 U.S. at 443, 31 S.Ct. at 498. One might argue that this fact renders meaningless the distinctions among the types of contempt sanctions — for instance, because all contempt sanctions are somewhat punitive, it makes no sense to distinguish punitive contempt sanctions from the other two types of contempt sanctions. This, however, is the equivalent of arguing that because all men have facial hair, it makes no sense to distinguish between bearded and non-bearded men. In both cases, the question is one of degree, and the fact that there will be difficult cases at the margins does not deprive the conceptual categories of their significance. Instead, difficult cases merely require a detailed “examination of the character of’ the sanction being imposed in order to determine whether it is punitive, compensatory, or coercive. Hicks v. Feiock, 485 U.S. 624, 636, 108 S.Ct. 1423, 1432, 99 L.Ed.2d 721 (1988).
B.
The types of sanctions — punitive, compensatory, or coercive — that can be used to enforce an injunction depend on the character of the conduct being enjoined. Consider first an injunction that commands the performance of a specific act. For instance, imagine a case in which the defendant operates a paper mill that is discharging pollutants onto the plaintiffs land. The plaintiff brings a lawsuit alleging a nuisance, and seeks an injunction ordering the defendant to shut down the mill. The plaintiff succeeds and the injunction is granted. The defendant, however, continues to operate the paper mill. The court, after conducting a show cause hearing and finding the defendant in contempt, could use any of the types of sanction previously discussed: a punitive sanction (such as a flat fine of $10,000), a compensatory sanction (such as a fine of $5,000, which is roughly equal to the harm caused, payable to the plaintiff), or a coercive sanction (such as a fine of $100 per day until the paper mill is shut down).
Next, consider an injunction that forbids the performance of a specific act. For instance, imagine a case in which an employee alleges that her corporate employer, through the actions of its CEO (who is also the majority shareholder), has, on a number of occasions, touched her in inappropriate areas. The employee claims that this behavior constitutes sexual harassment, in violation of 42 U.S.C. § 2000e-2(a)(l) (1994).[6] She files a lawsuit against her employer, seeking an injunction ordering the employer to cease the harassment.[7] She succeeds, and the in *1269 junction is granted. Nevertheless, the CEO continues the inappropriate touching. The court, after conducting a show cause hearing and finding the employer in contempt, can assess punitive sanctions (such as a flat fine of $10,000, payable to the court) or compensatory sanctions (such as a fine equal to the harm caused, payable to the employee). Coercive sanctions, however, are not available, because the act to be prevented by the injunction has already occurred — -in other words, there is no way to purge the contempt.[8] See Gompers, 221 U.S. at 442, 31 S.Ct. at 498 (“[I]f the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished. [Coercive sanctions] cannot undo or remedy what has been done.... ”).
To make the point clearer, try to imagine a court attempting to enter coercive sanctions in the situation outlined above. The court has enjoined the employer not to harass the employee. The employer nevertheless does so, and, after a show cause hearing, is held in contempt. The court fines the employer $100 per day until ... well, until what? Presumably, until the court is persuaded that the harassing CEO will not repeat his misbehavior. Thus, after three days of fines, the CEO contacts the judge and promises that he will never again sexually harass the employee. The court thinks the CEO was shifting his eyes a bit much when he made the promise, however, and therefore allows the fines to continue accumulating. After a week of fines, the CEO makes the same promise, but this time on his knees and with his hands clearly visible so that the court can see that the CEO’s fingers are not crossed. The court is still unpersuaded, and continues allowing the fines to accrue. This exercise would presumably continue until such time as the court, for whatever reason, decided that the CEO had learned his lesson.[9] Even then, the contempt would not have been purged, because the harassment would already have been fully accomplished. The point is simply that when an injunction forbids the performance of an act, coercive sanctions are not available to enforce the injunction.
Note that it is not the affirmative or negative phrasing of the injunction that is critical. An injunction commanding the performance of specific act (for instance, “shut down the paper mill”) could, in many cases, just as easily be phrased as an injunction prohibiting a ongoing harm (for instance, “do not operate the paper mill”). Likewise, an injunction forbidding the performance of a specific act (for instance, “do not sexually harass the employee”) could, in many cases, be phrased as an injunction commanding the performance of an ongoing duty (for instance, “treat male and female employees equally”). Cf. International Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 835, 114 S.Ct. 2552, 2561, 129 L.Ed.2d 642 (1994) (suggesting that an injunction directed at a union stating, “Do not strike,” is essentially the same as one stating, “Continue working”). Rather, it is the underlying nature of the injunction — specifically, whether it is commanding an act that the *1270 law requires or proscribing an act that the law forbids — 'that determines whether it can be enforced through coercive sanctions.
In sum, if an injunction commands the performance of a specific act (such as shutting down a paper mill), then all three types of sanctions are available to the court. If, however, an injunction forbids the performance of an act (such as sexually harassing an employee), then only punitive and compensatory sanctions are available to the court.
C.
The types of contempt sanctions available for violation of an injunction determine the effectiveness of the injunctive relief being given to the plaintiff. Specifically, as I discuss in this section, injunctions that are enforceable only through punitive and compensatory sanctions provide relief to a plaintiff that is — at best— duplicative of the relief available through an action for damages.[10] Only injunctions enforceable through coercive sanctions provide a form of relief that is unique to equity. They are therefore the only type of injunctions that courts should enter, on the basis of the rule that injunctions should not be granted where the plaintiff has an adequate remedy at law. See Weaver v. Florida Power & Light Co., 172 F.3d 771, 773 (11th Cir.1999).
Punitive sanctions provide essentially no relief to the plaintiff — as discussed above, the purpose of punitive sanctions is to vindicate the court’s authority, not to benefit a party to a lawsuit. Any benefit to the plaintiff from such a sanction is incidental and indirect. For instance, in the sexual harassment hypothetical in part I.B, supra, assume that the court chose to impose a punitive sanction — such as a fine of $10,-000 against the employer, payable to the court. This fine would do nothing to affect the harassment that had already occurred; at this point, the harassment is a “done deal” and the court cannot undo it. In addition, the fine would do nothing to compensate the plaintiff for the harm caused by the harassment. The only benefit provided to the plaintiff from the fine would be a deterrent: Because of the imposition of the fine, the employer might be less inclined to harass the plaintiff in the future. This deterrent, however, is equally available to the plaintiff through an action for damages: If, instead of seeking an injunction and then calling for a show cause hearing at which the employer was assessed punitive sanctions, the plaintiff had simply brought a damages action after the harassment occurred, the employer would be equally deterred. (Furthermore, the plaintiff would receive compensation for the harm caused, unlike in the injunction scenario.) In sum, every benefit that the plaintiff gets from an injunction enforced by punitive sanctions would be equally available in an action for damages.
Compensatory sanctions merely imitate the relief that would be provided in a damages action. For instance, returning to the sexual harassment example, assume that the court chose to impose a compensatory sanction on the employer. The court, after hearing argument from both parties, determined that the damage to the plaintiff from the harassment was roughly $5,000, and ordered the employer to pay that amount to the plaintiff. The fine does not affect the prior harassment (it is again a “done deal”), but compensates the plaintiff for the harm she has suffered. In this situation, the relief provided to the plaintiff imitates that which would be provided in a damages action — in terms of both compensation to the plaintiff and as a future deterrent to the employer. Again, as with punitive sanctions, every benefit that the plaintiff gets from an injunction enforced by compensatory sanctions would be equally available from an action for damages.
Coercive sanctions, in contrast, provide meaningful and unique relief to the plaintiff. For instance, using the paper mill *1271 hypothetical from part I.B, supra, assume that the court chose to impose a fíne of $100 per day on the defendant until he shut down the paper mill. The defendant is now subject to an ever-increasing pressure to take the action that the plaintiff seeks — a pressure that would not be available through an ordinary damages action. There is of course still no guarantee that the defendant will shut down the mill, but, because of the injunction, the plaintiff is able to exert greater pressure on the defendant to do so than would be possible in the absence of the injunction.
These observations lead to the conclusion that where an injunction is enforceable only through punitive or compensatory contempt sanctions,[11] and not through coercive contempt sanctions, the injunctive remedy being given to the plaintiff is no better than the remedy he could have obtained in an after-the-fact action for damages. Therefore, the plaintiff necessarily has an adequate remedy at law — or at least a remedy at law that is no less adequate than the injunctive remedy.[12] Consequently, the principle that an injunction will not be entered where the plaintiff has an adequate remedy at law forbids the entering of an injunction under such circumstances.
D.
In addition to violating equitable principles, an injunction that is enforceable only through punitive or compensatory sanctions may also violate the Constitution. Specifically, such an injunction has the potential to run afoul of the constitutional doctrine of separation of powers.
An injunction forbidding the performance of a particular act must be based on a conclusion that the act forbidden, if performed, would constitute a violation of the law. Otherwise, the court would be enjoining the performance of a perfectly legal act, which the court is without authority to do.
If the law on which the injunction is based is legislatively created, then the legislature is likely also to have created rules regarding the means by which the law should be enforced and the appropriate sanction for a violation of the law. For instance, the harassing behavior of the hypothetical CEO in part I.B, supra, is illegal as a result of Section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e — 2(a)(1) (1994). The procedure for enforcing Title VII is set forth in 42 U.S.C. § 2000e-5 (1994). Under that section, an employee alleging a Title VII violation must first file a charge with the Equal Employment Opportunity Commission (“EEOC”). If the EEOC decides not to bring a civil action against the employer, it must notify the aggrieved employee, who then has ninety days in which to bring a civil action on her own. See 42 U.S.C. § 2000e — 5(f)(1). If the action is successful, *1272 the types of relief available to the employee are set forth in 42 U.S.C. § 2000e-5(g).[13]
Once the employee obtains an injunction that orders the employer to cease the harassment, however, she can completely circumvent the procedure prescribed by Congress. No notice to the EEOC is necessary; the employee need only request a show cause hearing from the court. If the employer is held in contempt, the court can respond with compensatory or punitive sanctions. See supra part I.B. If the court imposes compensatory sanctions, the limitations on relief found in 42 U.S.C. § 2000e-5(g) will be inapplicable. Furthermore, the employer will have no means of raising many of the defenses that would be available in an ordinary civil action, such as laches. If the court imposes punitive sanctions, it will have effectively made criminal conduct that Congress has not deemed criminal (in light of the absence of statutory criminal punishments for violations of Title VII). Even if Congress had done so, the enforcement of the criminal law would be a matter for the executive branch, not the judicial branch.[14] Thus, regardless of whether the injunction is enforced through compensatory or punitive sanctions, the court has intruded on the province of the legislative and executive branches by altering the congressionally-created procedures and remedies for sexual harassment.[15]
In sum, an injunction enforceable only through punitive or compensatory sanctions constitutes an individualized criminal or civil law (respectively). This new law is duplicative of the existing law but with a different enforcement mechanism — contempt proceedings — and thus creates an opportunity to use different procedures and to impose different sanctions from those contemplated by the legislature under the circumstances. Therefore, where the action being enjoined is a violation of statutory law, the entry of an injunction implicates the constitutional doctrine of separation of powers. See Wilder v. Virginia Hosp. Ass’n, 496 U.S. 498, 508 n. 9, 110 S.Ct. 2510, 2517 n. 9, 110 L.Ed.2d 455 (1990) (noting that separation of powers requires “that Congress rather than the courts controls the availability of remedies for violations of statutes”); cf. NLRB v. Express Pub. Co., 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941) (noting that, except where a specific violation has been found, “Congress did not contemplate that the courts should, by contempt proceedings, try alleged violations of the National Labor Relations Act”).
E.
In light of all I have just said, a few caveats are in order. First, I am not saying that punitive and compensatory contempt sanctions are never appropriate means for enforcing an injunction. For *1273 instance, if a party is enjoined to produce certain documents and then destroys those documents, coercive sanctions would no longer be available. Under those circumstances, a punitive contempt sanction would be an important means of vindicating the court’s authority. The injunction nevertheless would have been appropriately entered, because coercive sanctions were a viable option at the time the injunction was entered and thus the injunction provided meaningful relief to the adverse party.
Second, a court may enter an injunction that is not enforceable through coercive contempt sanctions when the court enters the injunction in aid of its jurisdiction. For instance, if a government official is enjoined to perform a certain act, and another individual tries to prevent the official from performing the act, the court could issue an injunction commanding the individual to cease his interference. Such an injunction would be appropriate despite not being enforceable through coercive sanctions, because the injunction was not entered as a form of relief for a party to a lawsuit, and thus there is no issue as to whether that party would have an adequate remedy at law. Cf. 18 U.S.C. § 1509 (1994) (authorizing injunctive relief against persons who forcefully interfere with the performance of duties under a court order, regardless of whether the conduct enjoined is also independently criminal).
Finally, I am not denying the importance of the injunction in modern jurisprudence. The principles outlined above would have permitted, for instance, the use of the injunction in school desegregation cases. In such cases, the defendants were enjoined to undertake a specific, albeit complex, act: Create a unitary school system. Theoretically, the defendants could have been jailed until such time as they complied with the court’s mandate.[16] Once the commanded act had been done, however, the court’s mandate would have been fully obeyed and any contempt would have been purged.
F.
In conclusion, when a party seeks an injunction to create criminal and/or civil liability via the court’s contempt powers, rather than to coerce an adverse party into taking an action required of it, that party is using the legal device of an injunction for a purpose for which it was not designed.[17] See Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944) (“The historical injunctive process was designed to deter, not to punish.”). Such an injunction provides no relief for the plaintiff (or at least no relief that could not be obtained at law), and intrudes into areas constitutionally reserved for the legislative and executive branches. Therefore, when a court is faced with a request for injunctive relief, it should consider how the requested injunction is to be enforced. If the injunction cannot be enforced using coercive sanctions, then it should not be entered.[18]
*1274 II.
The appellants in this ease challenge two sets of provisions in the injunction entered by the district court. The first set of injunctive provisions enjoins the members of the DeKalb County Board of Education and the employees of the DeKalb County school system (such as principals and teachers) not to permit students to engage in various forms of religious activity.[19] For instance, the defendants were enjoined from “permitting ... vocal prayer; Bible and religious devotional or scriptural readings; distribution of religious materials, texts, or announcements; and discussions of a devotional/inspirational nature” in the DeKalb County schools. The defendants were also enjoined from “permitting ... prayers, invocations, benedictions, or devotional messages at graduation or commencement exercises.” Similar provisions were included in regard to public-address systems and school-sponsored assemblies and events.
These provisions, for the reasons outlined in part I, were entered in error. It is dear that the provisions are not enforceable through coercive sanctions. For instance, assume that a DeKalb County school principal violates the injunction by “permitting” a student prayer at graduation.[20] Plaintiff Jesse Chandler is present at the graduation, and, after hearing the prayer, obtains a show cause hearing from the district court.[21] At the hearing, the court holds the principal in contempt. In this situation, the harm sought to be prevented by the injunction — namely, the violation of Chandler’s Establishment Clause rights[22] — would already have occurred, and the court could do no more than punish the principal for his contempt or attempt to compensate Chandler for the harm caused. The only form of coercive relief imaginable under the circumstances would consist of fining or imprisoning the principal until such time as the district court was convinced (presumably on the basis of nothing other than the principal’s sincere-sounding promises) that he would *1275 not repeat the offense; even then, the coercive sanctions would not have provided Chandler with any relief because the harm would still be fully accomplished. Cf. Gompers, 221 U.S. at 442, 31 S.Ct. at 498. Thus, only punitive or compensatory sanctions would be available.
Insofar as the injunction would be enforced via punitive contempt sanctions, it would provide no direct relief to Chandler. The only benefit it would bring to Chandler would be a deterrent to the principal, one which would be equally available in an action for damages under 42 U.S.C. § 1983 (1994). Thus, the injunction, if enforced by punitive contempt sanctions, gives Chandler no better relief than that which he could obtain at law.
Furthermore, enforcing the injunction with punitive contempt sanctions would raise a separation-of-powers problem. A necessary prerequisite for the issuance of the injunction was the district court’s conclusion that the behavior to be enjoined— for instance, permitting a prayer at graduation — would constitute a violation of Chandler’s constitutional rights. Therefore, punitive sanctions in response to a violation of the injunction would in essence be punishment for violating Chandler’s constitutional rights. The legislature, however, has already prescribed the appropriate criminal punishments for violations of constitutional rights in 18 U.S.C. § 242 (1994), which states that whoever, under color of law, “willfully subjects any person ... to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States ..., shall be fined under this title or imprisoned not more than one year, or both.”[23] The enforcement of this provision is the job of the executive branch, meaning that Congress has determined that the United States Attorney, not the judiciary, is to determine whether the principal should be prosecuted. In such a prosecution, the full panoply of constitutional protections would apply, rather than the limited set that has been held to apply to the imposition of criminal contempt sanctions. See supra note 4. Furthermore, in a criminal prosecution, the principal could raise the defense, based on the “fair warning” requirement of the Due Process Clause, that section 242 does not clearly prohibit “permitting” a prayer at graduation. See United States v. Lanier, 520 U.S. 259, 267, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997) (discussing, in the context of a section 242 prosecution, the constitutional requirement that the statute under which the defendant is prosecuted must have “made it reasonably clear at the relevant time that the defendant’s conduct was criminal”). Such a defense would be unlikely to be available in a contempt hearing, because the injunction — unlike the statute — explicitly prohibits this behavior. In sum, criminal sanctions based on this injunction would constitute interference with the role of both the legislative and executive branches.[24]
*1276 Insofar as this injunction would be enforced via compensatory contempt sanctions, it would merely be imitating the relief available to Chandler under 42 U.S.C. § 1983. Again, as with punitive sanctions, the injunction would give Chandler no relief different from that which he could obtain at law.[25]
It would, however, provide that relief in a manner contrary to that which Congress contemplated in enacting section 1983, again creating a separation-of-powers problem.[26] For instance, in a section 1983 proceeding, the principal would be entitled to a trial by jury; this right is not guaranteed in a civil contempt proceeding. Furthermore, in an ordinary section 1983 suit, the principal could respond to the complaint with a motion to dismiss for failure to state a claim. If that failed, the principal could assert a defense of qualified immunity, on the ground that liability for “permitting” a prayer at graduation is not clearly established by Supreme Court or Eleventh Circuit precedent.[27] Neither of these responses is generally available in a civil contempt proceeding. Thus, unless the show cause hearing were in effect transformed into a new section 1983 suit— with a jury trial, the opportunity to raise *1277 defenses, and so forth — the court would be violating the doctrine of separation of powers.
The second set of provisions challenged by the appellants, unlike the first set, was perfectly appropriate for inclusion in an injunction. Those provisions relate to the district court’s command that the defendants (in conjunction with the plaintiffs) nominate three individuals, one of whom would serve as a monitor for the purpose of ensuring compliance with the injunction. This is a discrete act that, if not taken, could be compelled through coercive contempt sanctions (for instance, a fine of $100 for each day after the deadline that the list of individuals was not submitted). It was therefore properly the subject of an injunction.[28]
In conclusion, the first set of injunctive provisions challenged by the appellants are enforceable only through punitive or compensatory contempt sanctions. They consequently raise all of the problems discussed in part I, and therefore must be vacated. The second set of provisions, however, raise none of those problems, and, for the reasons stated in the majority opinion, should be affirmed.
III.
The injunction is an important remedial tool, but also one that has been greatly abused. By using an injunction as an alternative means of creating criminal and/or civil liability, courts ignore fundamental equitable and constitutional principles. Certain injunctive provisions at issue in this appeal illustrate this problem. I therefore concur in the majority opinion.

.The issues I discuss herein were properly not relied upon by the majority opinion for the simple reason that they were not raised by the appellants either in the district court or on appeal. They are, however, sufficiently important to our system of jurisprudence that I feel it is appropriate — indeed necessary — to address them sua sponte in this concurrence.

. This procedure is laid out in more detail in Wyatt v. Rogers, 92 F.3d 1074, 1078 n. 8 (11th Cir.1996).

. The principles set forth in Gompers have been recently reaffirmed in International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 826-29, 114 S.Ct. 2552, 2556-58, 129 L.Ed.2d 642 (1994).

. As stated in Young:
[Defendants in criminal contempt proceedings must be presumed innocent, proved guilty beyond a reasonable doubt, and accorded the right to refuse to testify against themselves; must be advised of charges, have a reasonable opportunity to respond to them, and be permitted the assistance of counsel and the right to call witnesses; must be given a public trial before an unbiased 'judge; and must be afforded a jury trial for serious contempts.
Young, 481 U.S. at 798-99, 107 S.Ct. at 2133 (citations omitted).

. The fine would presumably be paid to the court, although in theory it could be paid to the opposing party. Regardless of who received the money, because the clear purpose of the fine would be to pressure the contem-nor into compliance, the fine would be classified as coercive.

. The employee's claim would be that the CEO had created an "abusive work environment,” as opposed to a claim of quid pro quo sexual harassment. See generally Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (discussing "abusive work environment” claims).

. Injunctions of this sort actually amount to nothing more than injunctions to “obey the law,” which, for reasons different from those *1269 outlined here, have repeatedly been held invalid. See, e.g., Payne v. Travenol Labs., Inc., 565 F.2d 895, 897-98 (5th Cir.1978) (holding that injunctions to "obey the law” violate the requirements of Fed.R.Civ.P. 65(d) that an injunction “be specific” and "describe in reasonable detail ... the act or acts sought to be restrained”). (In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.)

. The situation might be different depending on the nature of the harassment. For instance, if the harassment consisted in part of the placement of pornographic pictures throughout the office, the employee could seek an injunction ordering that the pictures be removed. If the injunction was granted, it could be enforced through coercive sanctions — for instance, a fine of $200 per day until the pictures were removed.

. In contrast, where the contemnor is enjoined to perform a specific act, promises of future compliance are neither necessary nor relevant — the contemnor can avoid sanctions by (and only by) performing the commanded act.

. This is not to say that punitive and compensatory sanctions should never be used to enforce injunctions. Some examples of their proper use will be discussed in part I.E, infra.

. As discussed in part I.B, supra, injunctions are enforceable only through punitive or compensatory contempt sanctions when they forbid the performance of an act (or command the performance of an ongoing duty).

. An injunction enforceable only through punitive or compensatory sanctions does give a plaintiff one benefit that a damages action cannot provide: an ex ante declaration of the rights of the parties. For instance, consider a case in which the defendant is preparing to remove some trees from a plot of land. The plaintiff, asserting that the land is his, seeks an injunction (based on the law of trespass) forbidding the defendant from removing the trees. The plaintiff succeeds and the injunction is issued. The defendant, having previously believed that the land was his, may now be persuaded to change his behavior. Thus, although the injunction would not be enforceable through coercive contempt sanctions (because it forbids the performance of an act), it would nevertheless have provided the plaintiff with meaningful relief in the form of an ex ante declaration of rights. If, however, this is the only form of relief being provided to the plaintiff, then the appropriate rerhedial vehicle is a declaratory judgment, not an injunction. See 28 U.S.C. § 2201 (1994).
The distinction is not merely a formal one: Injunctions, unlike declaratory judgments, implicate the court's contempt powers and thus subject the enjoined party to sanctions should he disobey. Declaratory judgments therefore do not raise the same separation-of-powers concerns as injunctions, as discussed in part I.D, infra.

.Section 2000e-5(g) specifically authorizes injunctive relief for violations of Title VII. This provision could conceivably be read as congressional authorization of injunctive relief regardless of whether the plaintiff has an adequate remedy at law. The more reasonable reading of the provision is that it means merely that injunctive relief is allowed when the traditional equitable requirements are met — including the absence of an adequate remedy at law. See Sanchez v. Philip Morris Inc., 774 F.Supp. 626, 630-31 (W.D.Okla.1991) (denying an injunction in a Title VII case on the ground that the plaintiff's legal remedies are adequate); cf. Hecht Co. v. Bowles, 321 U.S. 321, 329-30, 64 S.Ct. 587, 591-92, 88 L.Ed. 754 (1944) (holding, in regard to a similar provision in the Emergency Price Control Act, that the traditional rules of equity still apply to the granting of injunctions). Even if I am mistaken in this view, however, this means merely that Title VII is an exception to the general rule (much like securities law, see infra note 18) and takes nothing away from the broader point being made in the text.

. This is one of the reasons for the equitable principle that equity will not enjoin the commission of a crime. See 11A Charles Alan Wright et al., Federal Practice and Procedure § 2942, at 70-71 (2d ed.1995).

. The court could avoid this problem only by conducting a contempt proceeding that, in every relevant way, duplicated a criminal or civil trial.

.The more common approach was to require school districts to submit to the court a plan for creating a unitary school system; if the plan was approved by the court, the court would retain jurisdiction to see if implementation of the plan succeeded in fulfilling the court's mandate. See, e.g., Brown v. Board of Educ. of Topeka, Kan., 139 F.Supp. 468, 470 (D.Kan.1955). When various obstacles prevented fulfillment of the mandate — for instance, outside interference or obstinacy by certain officials — courts often issued injunctions in aid of their jurisdiction (sometimes enforceable only through punitive contempt sanctions, as discussed supra) to ensure compliance with their initial orders.

. Indeed, if such an action were taken by a plaintiff deliberately, it would likely amount to the tort of abuse of process. Cf. Dykes v. Hosemann, 776 F.2d 942, 950 (11th Cir.1985) (Tjoflat, J., concurring in part and dissenting in part).

. An exception that proves the rule can be found in the area of securities law. Most SEC enforcement actions are resolved by injunctions (entered pursuant to consent decrees) that order the defendant essentially to do nothing more than obey the securities laws. See, e.g., SEC v. Clifton, 700 F.2d 744, 746 (D.C.Cir.1983). These injunctions allow the SEC to punish repeat offenders without *1274 having to bring a separate lawsuit for each offense; instead, the commission needs only to request a show cause hearing to obtain sanctions against the offender. See id. at 748. This practice is permissible, however, only because Congress has specifically authorized it in the Securities Act of 1933. See 15 U.S.C. § 77t(b) (1994); SEC v. Jones, 85 F.2d 17, 17 (2d Cir.1936) (noting that, because of the Securities Act, the SEC need not allege the absence of an adequate remedy at law when seeking injunctive relief). This specific congressional authorization suggests that such a practice would be impermissible if not so authorized.

. The members of the DeKalb County Board of Education (and their successors in office) are the defendants in the lawsuit. The injunction extends to the employees of the school system on the ground that they are "in active concert and participation with" the defendants.

. In addition to the problems with the injunction outlined above, the injunction's command that the defendants not "permit" certain activity is too vague to satisfy the requirements of Fed.R.Civ.P. 65(d). See American Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1411 (11th Cir.1998); Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1531 (11th Cir.1996). What exactly does it mean, for instance, for a principal to "permit" a prayer at a school’s graduation? Does it mean merely that if he is aware that a student speaker is going to pray, then he must ask the student not to do so? Must he prevent the student from speaking altogether once he is aware that the student is inclined to pray? If a student speaker surprises the principal with a prayer at graduation, must he, at once, rush on stage and attempt physically to remove the student from the microphone? This vagueness makes it impossible for the defendants to know exactly what the injunction requires of them.

. The only plaintiffs in the case against the DeKalb County Board of Education are Michael Chandler and his son Jesse, a seventh-grade student in the DeKalb County school system. Michael Chandler appeared as "next friend” for his son.

. I seriously doubt, in light of the majority’s analysis, that a principal who permits a prayer, without more, has violated a student’s Establishment Clause rights. For purposes of my analysis, however, I will assume the correctness of the district court’s conclusion to the contrary.

. Conspiracies to violate this provision are outlawed by 18 U.S.C. § 241 (1994), which authorizes fines and imprisonment of up to ten years. Thus, if the United States Attorney could demonstrate that the principal conspired with, for instance, one or more members of the DeKalb County Board of Education to permit the prayer, it could obtain convictions under section 241 in addition to section 242.

. Congress has responded to this problem to some degree in 18 U.S.C. § 402 (1994), titled, “Contempts constituting crimes.’’ Under that section, where conduct constituting contempt of a district court order also constitutes a crime under federal or state law, the alleged contemnor is entitled to a trial by jury. Furthermore, the contemnor cannot be sentenced to more than six months imprisonment and cannot be assessed a punitive fine of more than $1,000.
One could contend that this statute implicitly authorizes the sort of “end run” around criminal procedure that I am attacking, and thus eliminates any separation-of-powers problem. After all, why would Congress pass a law prescribing procedures and penalties for contempts constituting crimes if it did not consider injunctions necessarily leading to such contempts (if disobeyed) to be acceptable?
A look at the legislative history of section 402 dispels this contention. Section 402 was passed in 1914 to prevent the abuse of labor injunctions. Congress was concerned that corporations were obtaining injunctions forbidding certain union activity; these injunc *1276 tions were then enforced through summary contempt proceedings. (The constitutional protections that are now available in criminal contempt proceedings, see supra note 4, were not available at that time.) The result was the imposition of penalties for violations of the criminal law, but without the benefit of a jury trial. Section 402 was intended to minimize this problem. See United States v. Pyle, 518 F.Supp. 139, 152 (E.D.Pa.1981) (discussing legislative history); 48 Cong. Rec. 8778 (1912) ("The courts have, under the guise of contempt of court, had men arrested and tried for crimes without the intervention of a jury.” (statement of Rep. Clayton)).
In light of this legislative history, it is difficult to read section 402 as Congress’ stamp of approval on injunctions enforceable only through punitive (or compensatory) sanctions. On the contrary, section 402 arises out of disapproval of such injunctions. See id. at 8779 (“This bill is to prevent a man or, say, a corporation, rich and powerful, getting out a blanket injunction at midnight, broad as the canopy of heaven in its terms, and then oppressing the poor, humble laborer.” (statement of Rep. Clayton)). The fact that Congress chose to address the problem by limiting the damage at the back end (when contempt sanctions are imposed) in no way implies approval of the practice at the front end (when the injunction is issued). Cf. id. at 8798 (quoting statement of Rep. Sabath that the bill is not as broad as it should be, but is a step in the right direction).
Furthermore, had Congress intended so radical a move as to abolish completely the longstanding equitable principle that equity will not enjoin a crime, see supra note 14, it surely would have said something to indicate such an intent. Cf. Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944) ("We cannot but think that if Congress had intended to make such a drastic depar-lure from the traditions of equity practice, an unequivocal statement of its purpose would have been made.”). Nothing in the legislative history suggests that this is the case.

. The fact that exhaustion of state remedies is not required in section 1983 actions does not alter the requirement that a plaintiff seeking injunctive relief on the basis of section 1983 must demonstrate the absence of an adequate remedy at law. See Wallace v. Kern, 520 F.2d 400, 407 n. 13 (2d Cir.1975).

. This problem might not arise if the alleged violation of Establishment Clause rights was caused by a federal, rather than a state, official. Under those circumstances, the congressionally-created remedial scheme of section 1983 would be inapplicable, and a judicially-created remedial scheme based on Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in which a cause of action is implied from the Constitution, would apply. (The adequate-remedy-at-law problem would of course remain.) In this case, however, Congress has created a remedial scheme for the constitutional violation (section 1983) and therefore, in the absence of a showing that the congressional scheme is inadequate, the courts are to defer to Congress. See McCarthy v. Madigan, 503 U.S. 140, 151, 112 S.Ct. 1081, 1090, 117 L.Ed.2d 291 (1992).

. "[T]he qualified immunity test is simply the adaptation of the fair warning standard [from criminal law] to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes.” Lanier, 520 U.S. at 270-71, 117 S.Ct. at 1227.

. The unchallenged portions of the injunction are a mix of proper and improper provisions. For instance, in addition to enjoining the defendants from "permitting” certain religious activities, it also enjoins them from "aiding, abetting, commanding, counseling, inducing, ordering, procuring, or otherwise participating in” those activities. Regardless of which gerund is chosen, these injunctive provisions still forbid the performance of an act, and are therefore'inappropriate. Other provisions, however, enjoin the defendants to promulgate a written policy relating to religious activity in schools, to provide the Gide-ons with a copy of the injunction, and to conduct a training session to instruct faculty and administrators regarding the Establishment Clause and the Free Exercise Clause. These provisions command the performance of specific acts, and are thus, at least in form, perfectly legitimate.